J-A29025-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| A.D.W. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| L.A.K. | |
| Appellant | No. 507 WDA 2016 |

Appeal from the Order Entered March 11, 2016
In the Court of Common Pleas of Jefferson County
Civil Division at No(s): 560 CD 2013

BEFORE:  DUBOW, J., MOULTON, J., and MUSMANNO, J.

MEMORANDUM BY MOULTON, J.:                    **FILED DECEMBER 15, 2016**

L.A.K. ("Father") appeals from the March 11, 2016 Order entered in the Jefferson County Court of Common Pleas granting the petitions of A.D.W. ("Mother") for relocation to California and modification of custody of their child, J.T.W. ("Child").  We affirm.

On July 14, 2014, the trial court denied Mother's earlier proposed relocation to Hawaii and modified Father's partial custody schedule.  Mother, who had already relocated to Hawaii with Child, appealed.  On April 10, 2015, this Court affirmed the trial court's decision.  After Father filed a petition to enforce the custody order, Mother returned to Pennsylvania and immediately filed petitions to modify the custody order and to relocate to San Francisco, California.  On March 11, 2016, after hearing testimony over the course of three days, the trial court granted Mother's petition to relocate.

The trial court also granted primary physical custody to Mother and partial physical custody and visitation to Father. Father filed a timely notice of appeal.

The trial court ably set forth its factual findings, which we adopt and incorporate herein. **See** Trial Court's Findings of Fact, Discussion and Conclusions of Law, 3/11/16, at 1-27 ("Trial Ct. Op.").

Father raises the following issues on appeal:

> I. Did the Trial Court err and/or abuse its discretion in misapplying the facts to the statutory factors under 23 Pa.C.S. Section 5328, resulting in numerous conclusions that are unreasonable under the circumstances as shown by the record?
>
> II. Did the Trial Court err and/or abuse its discretion in that it unreasonably did not give any consideration to mother's history of contemptuous behavior?
>
> III. Did the Trial Court err and/or abuse its discretion in that it unreasonably did not give any consideration to mother's history of lodging false accusations against father?
>
> IV. Did the Trial Court err and/or abuse its discretion when it reached inconsistent conclusions, which are not supported by the record?
>
> V. Did the Trial Court err and/or abuse its discretion when it did not require mother to fully meet her burden in determining that the relocation is in the child's best interest?
>
> VI. Did the Trial Court err and/or abuse its discretion in its application of 23 Pa.C.S. Section 5337(h)?

Father's Br. at 38-39.

"Our concern in any custody or relocation matter is the best interest of the child, which considers all factors, on a case-by-case basis, that legitimately affect a child's physical, intellectual, moral, and spiritual well-being." **S.J.S. v. M.J.S.**, 76 A.3d 541, 554 (Pa.Super. 2013). In custody cases, our standard of review is as follows:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

**C.R.F. v. S.E.F.**, 45 A.3d 441, 443 (Pa.Super. 2012) (quoting **A.D. v. M.A.B.**, 989 A.2d 32, 35-36 (Pa.Super. 2010)) (internal citations omitted). This Court has also stated that "the discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned." **Ketterer v. Seifert**, 902 A.2d 533, 540 (Pa.Super. 2006) (quoting **Jackson v. Beck**, 858 A.2d 1250, 1254 (Pa.Super. 2004)). "[T]he knowledge gained by a trial court in observing

witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record." *Id.*

"An abuse of discretion is not merely an error of judgment." *Bulgarelli v. Bulgarelli*, 934 A.2d 107, 111 (Pa. Super. 2007) (quoting *Arbet v. Arbet*, 863 A.2d 34, 39 (Pa.Super. 2004)). A trial court abuses its discretion when it "overrides or misapplies the law, or exercises judgment which is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will." *ABG Promotions v. Parkway Publ'g, Inc.*, 834 A.2d 613, 616 (Pa.Super. 2013) (*en banc*).

In his first issue, Father contends that the trial court misapplied the factors in 23 Pa.C.S. § 5328[1] in reaching its decision. Father's Br. at 43-44.

---

[1] The factors to be considered when determining an award of custody are:

> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
> (3) The parental duties performed by each party on behalf of the child.
> (4) The need for stability and continuity in the child's education, family life and community life.
> (5) The availability of extended family.

*(Footnote Continued Next Page)*

In particular, Father argues that the trial court misapplied the first factor, "[w]hich party is more likely to encourage and permit frequent and continuing contact between the child and another party." *Id.* Father argues that the trial court erred in making the unsubstantiated finding that he would deprive Mother of custody. *Id.* at 44. Father also argues that the trial court erred in applying the fifth factor, "availability of extended family." *Id.* at 43,

---

*(Footnote Continued)*

(6) The child's sibling relationships.
(7) The well-reasoned preference of the child, based on the child's maturity and judgment.
(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.
(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.
(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.
(11) The proximity of the residences of the parties.
(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.
(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.
(14) The history of drug or alcohol abuse of a party or member of a party's household.
(15) The mental and physical condition of a party or member of a party's household.
(16) Any other relevant factor.

23 Pa.C.S. § 5328.

45. He maintains that this factor "clearly and importantly favor[ed him]." *Id.* at 45.

The trial court addressed Father's first issue in its opinion, applied the relevant factors, and did not abuse its discretion in finding that the factors weighed in favor of Mother. We agree with, and adopt, its reasoning. *See* Trial Ct. Op. at 25-28.

In his second issue, Father contends that the trial court failed to consider Mother's "contemptuous behavior." Father's Br. at 46. We disagree. Contrary to Father's assertion, the trial court both considered and thoroughly addressed Mother's past behavior; we agree with, and adopt, the trial court's reasoning. *See* Trial Ct. Op. at 13, 23, 27.

In his third issue, Father contends that the trial court failed to consider Mother's "history of lodging false accusations against Father." Father's Br. at 47. Here again, the record belies this claim. In its opinion, the trial court did consider and address Mother's past accusations against Father in reaching its decision; we agree with, and adopt, its reasoning. *See* Trial Ct. Op. at 23, 26, 29.

In his fourth issue, Father contends that the trial court's legal conclusions were unsupported by the record. Father's Br. at 48. More specifically, Father argues that the trial court did not consider how awarding primary physical custody to Mother would affect the bond between Father and child. The trial court addressed this issue in its opinion, and granted

Father a level of visitation designed to ensure that the Father-Child bond would not be adversely affected. We agree with, and adopt, the trial court's reasoning. *See* Trial Ct. Op. at 26, 28-29; Order of Court, 3/11/16, at 1-27.[2]

In his fifth and sixth issues, Father contends that the trial court erred in applying the relocation factors.[3] Father's Br. at 51. Father argues that

---

[2] Father also reiterates here his second claim regarding Mother's unwillingness to follow court orders. Father's Br. at 51. As discussed above, this Court agrees with the trial court's reasoning. *See* Trial Ct. Op. at 13, 23, 27.

[3] The relocation factors are:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.
(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.
(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.
(4) The child's preference, taking into consideration the age and maturity of the child.
(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.
(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

*(Footnote Continued Next Page)*

Mother would interfere with his relationship with the child. *Id.* He also argues that the trial court did not find that any of the section 5337(h) factors favored Mother, with the exception of factors six and seven, and that even those findings were based on assumptions. *Id.* Father maintains that because of the distance between Pennsylvania and California, his bond with Child will be adversely affected. *Id.* at 51-52. Father also argues that Mother could have found appropriate employment in Pennsylvania. *Id.* at 52. Finally, Father contends that Mother did not meet her burden in proving that relocation was in Child's best interest. *Id.* at 51.

While cross-country relocation undoubtedly presents significant challenges to all concerned, the trial court addressed Father's fifth and sixth issues in its opinion, applied the relevant factors, and did not abuse its discretion in finding that relocation was in Child's best interest. We agree with, and adopt, its reasoning. *See* Trial Ct. Op. at 6-9, 12-14, 18-22, 24, 25-27, 28-30.

*(Footnote Continued)* ———————

    (7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.
    (8) The reasons and motivation of each party for seeking or opposing the relocation.
    (9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.
    (10) Any other factor affecting the best interest of the child.

23 Pa.C.S. § 5337(h).

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/15/2016</u>

IN THE COURT OF COMMON PLEAS OF
JEFFERSON COUNTY, PENNSYLVANIA
CIVIL DIVISION

A      D. W              ,
                    Plaintiff,                    :
                                                  :
          v.                                      :      No. 560 CD 2013
                                                  :
L. A      K            ,                           :
                    Defendant.                    :

## FINDING OF FACT, DISCUSSION AND CONCLUSION OF LAW

1. This case began its second trip through the Jefferson County Court system on June 2, 2015, when the plaintiff filed a Petition to Permit Relocation and modify the defendant's schedule of partial custody. This occurred just before a hearing on a Petition to Enforce and Contempt of this Court's prior Order entered by Judge Morgan which had never followed by the parties from the date of its issuance. On October 6, 2015, Father filed an Answer to the Petition to Relocate and a counter Motion to Modify Custody wherein he asked for primary physical custody.

2. A temporary custody order was put into effect and after many evaluations, mediations and motions, this Court heard testimony on three separate days: October 9, 2015; January 13, 2016; and February 2, 2016. .

3. Mother is A        D. W        : who resides with her mother and her minor child at Jefferson County, Pennsylvania 15840.

4. Father is L. A      K                              Lancaster County, Pennsylvania 17501.

5. The parties are the parents of a minor child, J      T      W        , date of birth July 2013, age two.

6. The parties were before this Court Senior Judge William Morgan in April and May of 2014, and on July 14, 2014, Judge Morgan denied Mother's proposed relocation to Honolulu, Hawaii, and modified the partial custody schedule of Father. At the time the opinion was issued Mother had already moved to Hawaii with the minor child.

7. On April 10, 2015, the Superior Court filed an unpublished Opinion and affirmed the trial court decision regarding Custody and Relocation. After actions filed to enforce the custody order in both Pennsylvania and Hawaii, Mother returned to Pennsylvania and immediately filed petition to modify custody (to an order she had never followed) and a request to relocate to San Francisco, California.

1

A TRUE COPY
ATTEST:
PROTHONOTARY · CLERK

844a

8. The first witness called was Michelle L. Strait, who has a professional address of 529 Sunflower Drive, DuBois, Pennsylvania, where she is an LPN at DuBois Pediatrics. She testified as follows:

    . a. She has been an LPN for five years and worked with Dr. Fatula for three years who is the pediatrician for the minor child and she has met both parents in the doctor's office.

    b. On Thursday October 8, 2015, in the afternoon, she had an appointment where she was supposed to meet and observe the child while he was getting an immunization. When she went to get the child from the waiting room, Mother was holding the child with his head buried in her chest. Father was standing in front of Mother making a scene, saying "This is my child ... give me my child!"

    c. She indicated that others in the waiting room had moved away from the couple.

    d. She described his tone as "very loud" adding "Everyone was scared. I was scared. The tone of his voice ... no child should have to be put through that."

    e. She indicated that all parents in the waiting room had a look of a flat affect; therefore she decided to take the parties into the treatment room as quickly as possible.

    f. She indicated that parents and their significant others are allowed in the room as long as it is "ok." She indicated that Mother wanted her boyfriend in the room while Father was arguing that he should not be in the room. Mother indicated that she did not want to be alone with Father.

    g. Mother indicated that her fiancé then left the room.

    h. The child did good with his injection being on Mother's lap where he was more comfortable.

    i. She indicated that both parents left while she was cleaning up and another co-worker said they were out by the pop machine.

    j. When she went out to look, she witnessed that Father was standing where he blocked the back driver's side door of Mother's van, which would not allow Mother and Child to get in. She could see Father jumping up and down and flipping Mother's fiancé "the bird."

    k. She described the scene as very emotional stating Father came around the car and got right in the fiance's face, flipping his bird approximately one inch from the fiance's nose. Once they got the child in and fiancé was in the driver's seat, Father put his head in the car and flipped off Mother's fiancé again.

    l. She thought Father might be coming back in the office and was concerned that he might have a gun or knife.

    m. She described the fiance's behavior as calm stating "He didn't flinch and didn't argue."

    n. She was aware that someone had called the police so she did not call the police.

    o. She describes that every time these parents come in together, Father puts Mother down verbally and tries to take the child away from her stating "He is loud, disrespectful and rude."

    p. She indicated that she has never seen any evidence of a bond, she has never seen him hold the child and Father is always agitated when he is in the office.

2

q. She indicated that she does not personally know either parent and that she does not know the history of their case.

9. The next witness called was Manessa E. Beal, who has a professional address of 529 Sunflower Drive, DuBois, Pennsylvania, where she is an LPN at DuBois Pediatrics. She testified as follows:

a. She has been an LPN with Penn Highlands DuBois Pediatrics and has worked with Dr. Fatula for ten years as of December, 2015.

b. She was working the day of the immunization shots and witnessed Father standing in front of Mother holding his arms out to get the minor child stating he was "Making a scene in the waiting room." She indicated that Mother's fiancé, FM , just shrugged his shoulders.

c. Because of the scene Father was making, she thought it was best to get the child in as soon as possible.

d. She indicated that Father was very loud and demanding screaming "I want my son! I want my son!" When they went to the exam room, she heard him saying "I don't want that man back there." Because of this, she told another associate to get security ready.

e. She saw both parents by the pop and candy machine and she told her associates not to close the door so Mother could feel safe and have a place which to retreat.

f. She was also scared of a gun or knife and a return to the office by Father but indicated that there was a police officer who walked in to ensure everybody's safety before he left.

g. She described the fiancé's, FM 's, tone as being calm and he was not saying a word while Father was jumping and had a very fearful tone in his voice.

h. She indicated that the whole office is "on its toes" when they are aware Father is coming into the office.

10. The next witness called was Justin K. Lougee who resides at 120 Robinson Street, DuBois, Pennsylvania. He is the brother-in-law of A D W and he testified as follows:

a. He has attended several exchanges at the request of his mother-in-law, C W , because she was worried about her and the child being alone with Father at Sheetz. He indicated that he goes to help out the child .

b. He was present on Thursday, August 13th, and he stated his mother-in-law backed in, told the child "J , good bye, I love you," and she handed him to Father. Father's first question was "Where's the child's mother at?" While asking this he was simply holding the child on his left arm. He then looked at the car and said "This man and this woman are trying to keep you away from me." He indicated that Father only said two things to him, one was "Hello" and the other was asking if he had any clothes.

c. He said that Father said "I want to talk to you about my child's mother." He indicated that the tone was loud and stern and very upsetting for everyone. There were many people around and he indicated that Father asked others to join him.

d. He indicates that the minor child just looks ahead with a blank stare while his father is doing this. Meanwhile, his mother-in-law is upset and bawling. He further

3

indicates there was no provocation of Father. He indicated he is no longer willing to have exchanges saying "I have a wife and three kids."

    e. From what he saw, his mother-in-law does not try to engage Father; however, Father does try to engage her.

    f. When Father asks about the child's mother or the child, his mother-in-law responds "Ask your attorney."

    g. Justin also discussed a time he believed to be December 13th when he picked up his nephew at the Sheetz in Lancaster, Pennsylvania, accompanying him was his Father, John Lougee. He described that LAK was texting and videotaping and made the two Lougees wait while J was crying.

    h. He described the child crying as "part of the gig" saying Father makes it difficult during exchanges. He further testified that a two year old would and should be upset at exchanges but Father did nothing to calm the minor child or to help the situation.

11. The next witness called was Julie E. Popson who resides at 501 Grant Street, Reynoldsville, Pennsylvania. She lives with her husband and two children. She is the sister of Justin Lougee. She testified as follows:

    a. She accompanied maternal grandmother on September 20, 2015, to pick up the child in Lancaster. She indicated that Father was there with his mother who said "Good bye, Max" when the child was leaving the car. When maternal grandmother offered to help with the child, he said to her "Want me to put my son in the car ... I will put my son in the car." She indicated that he was screaming at both her and maternal grandmother asking "Who are you ... I need to know who you are?"

    b. She indicated that he continued to hold the door open and slapped on the hood of the car stated the following quote "Be good Christian women."

    c. She indicated the following Thursday, she was at the Falls Creek Sheetz with maternal grandmother when Father came and never acknowledged the child but opened his door and flipped maternal grandmother the bird. She then indicated there were two motorcycle guys who Father started screaming at and calling them over and flips maternal grandmother the bird again.

    d. As they called the cops, LAK was doing jumping jacks in the parking lot and he then upon receiving new shoes for J says "You can shove them."

    e. Father then started telling the minor child to say "Bye Bye Mimi." He got the child agitated. She indicated that her never said anything to his son to calm him.

    f. She indicated they did nothing to provoke him or start anything but that he cannot be peaceful.

12. The next witness called was Christi A. Jarbeck, who resides at 110 Orchard Avenue, Punxsutawney, Pennsylvania. She testified as follows:

    a. She is a nutrition aid who works at the WIC Office in Punxsutawney and that she is Mother's first cousin, with the maternal grandmother being her mother's sister.

    b. She accompanied her aunt on a pick up in Lancaster, Pennsylvania, on Sunday, September 13th wherein Father pulled in, brought the child close to the car and said, very loudly "Son, I am handling this. I am taking care of this. Don't know where your mother

4

is. I have a right to know what my son is doing." She described the situation as very eerie, saying that his tone was authoritative and pushy.

   c. She indicated that Father's behavior was very upsetting to a two year old.

   d. She indicated that she had a further horrible feeling because Father pulled his car in front of maternal grandmother's car so that she could not pull away.

   e. She indicated that Father's tone was very threatening and his voice gets louder and louder.

   f. Her aunt and the child were visibly shaken by Father's tone and behavior.

   g. She indicated that maternal grandmother said and did nothing other to take a step back and tell Father not to shove the shoes at her.

   h. On November 20, 2016, the Lancaster pick up when they were there, LAK pulled out his phone and said "Smile Chris," to which she responded "You do not have the right to take a picture or film me."

   i. He then told her "So, you testified in Court. Go ahead and testify against me." He then accused her of not being divorced.

   j. After checking the car seat, J     was not buckled in.

   k. She admitted that she still goes to exchanges with her aunt although she indicates she is afraid of LAK .

   13. Next witness called was C          "Chris" W        , maternal grandmother, who lives at ‹                              , Pennsylvania, and testified as follows:

   a. She lives at her residence in .               with her daughter ADW  and grandson, J   . She is a widow who assumes the transport responsibility out of fear for her daughter's safety.

   b. She is afraid of the father and only put herself in the position of being alone at one exchange.

   c. She tries to encourage the child at every stop saying "You are going with Daddy for a long ride. You are going to have a good time and get to see other kids and have fun." She tries to keep it simple to keep her grandson happy.

   d. LAK  started telling her they are not to talk.

   e. She recounted at one transfer after he put the child in the back of the car, he came around opened the back door and said "Where is his mommy?" He said that over five times and then changed that to "I have the right to know what is going on in my son's life." She said while he was saying this, he would not leave.

   f. She indicated that he does not kiss or hug his child at the exchanges.

   g. Knowing that it is a long ride, she always tries to have someone in the back seat with the minor child.

   h. She indicated that he has at times approached the person in the back seat and said "Where is his mommy?" Adding "Do you think I don't know where my son's mother is." This was to a 14 year old girl who was traveling with the child.

   i. She indicated that ADW  is afraid of him and if they are together at transports, she will go in to the store until he leaves.

   j. She indicated that at every pick up Father demands to know where ADW  is.

   k. He keeps asking the same questions.

   l. She indicates there have been times when he has to buckle the child in the seat and the seat is not buckled because he is so agitated and animated in his questions.

5

848a

m. She recounted the time when he flipped the bird through her window when the motorcycle guys were there, she indicated "Thank God J    was looking forward."

n. She said he placed his hands on the roof of the car when she told him to take his hands off the car, he said "Go ahead and call the police."

o. She indicated that he is so animated that she can no longer consistently get people to go to pickups or drop-offs.

p. She indicated that she has never said anything derogatory about Father but refuses to discuss any issues in front of her grandchild.

q. On January 16th, Ms. W    testified that since the last hearing exchanges were getting no easier. She discussed Father taking pictures or recording her or pointing out cameras at Sheetz saying "They are recording you."

r. At these exchanges, she testified that he told his son that "These are bad people who are keeping you away from me and taking you away."

s. At that visit, he hit the car with his hand and told the person who was in the car "You know Chris    is keeping my son from me. You show up again and I am going to mace your face." He said this in front of his son, J   .

t. On February 2nd, she testified to the drop off which occurred the Thursday before when Father had a little boy with him and she asked if the boy if he was going to ride to Lancaster. While she was doing this and talking to the little boys, LAK was saying "She's not like this ... She's not like this."

u. The parties had to negotiate a separate time to pick up on the last Monday in January due to the snowstorm that hit Lancaster. Father viewed this as putting his child in danger when the W    had checked out the roads and everything was fine going down to Lancaster.

v. She indicated that at those visits he was taking pictures with his cell phone the entire time.

14. The next witness called was F   M       who lives at        _         ,  Hawaii 96815. He testified as follows:

a. His date of birth is December 12, 1972, and he is 42 years of age. He has no children.

b. He is a consultant and got his Bachelor of Science Degree in Engineering at UCLA and MBA at the University of Hawaii. He is engaged to A  D  W      and has been since Mother's Day of this year.

c. He indicates that in his field he can bill clients up to $30,000.00 a month but it has to be in the software field which is only hiring in New York on the East Coast and/or small market software which is only a West Coast Enterprise.

d. He indicates that if Mother is allowed to relocate to San Francisco, he will have no problem finding a good job and providing the child with a good education.

e. His parents live in Sacramento, California, and they are primary care doctors. When they emigrated from the Philippines, they picked Sacramento so he intends to leave Hawaii and go to San Franciso.

f. He indicates that he met J    in 2014 at his first birthday party when he was one of four guests.

g. He believes he has a good relationship with J   . He indicated that he has many nieces and nephews who are at a young age, comparable to J   's; therefore, he

6

849a

has played with the child early to establish his ability to be successful in his contacts with the child.

h. He indicated that he knows there is a strong obligation to encourage a healthy relationship between J     and his parents and that he does not like conflict.

i. He always likes to keep things nice, productive and positive.

j. He likes to think things through in a positive way.

k. He has heard J     's father say awful things but FM   has held his feelings inside.

l. He accompanied ADW  to the DuBois pediatrician for J     's first shots and said "It was not good." When they walked into the office, Father grabbed the child's bag of clothes and pulled them away and then started yelling "Can I have my son? Can I hold my son?"

m. FM  : indicated that he told him "Just let her register," to which Father responded "Just stop talking."

n. From his observation, the child had started to burrow into his mother, but Father kept up the request of giving him his son.

o. FM   finally told him to please sit down and then he said "I'm asking you to sit down, please." To which Father sat down.

p. The nurse came out to tell the parents to come back, Father looked at FM   and said "No, you stay here." Mother looked at him and said "Come along." FM   felt the situation was dangerous.

q. After they went back, the shot was done in a minute and they then turned to leave and at the pop machine, Father blocked them.

r. FM   indicated that they could talk at Sheetz and he walked out to get into the car wherein Father attempted to stop them from getting into the car. He said Father was jumping and dancing and clapping his hands. Father stared straight into FM   's eyes when Father told him "Good luck ladies."

s. FM   indicated that he witnessed most of the Skypes in Hawaii and Father was very inappropriate from growling to screaming and yelling at Mother to Skyping from a toilet.

t. He indicated that just put in whatever time they can in order for Father to have his Skypes; however, he gets angry especially when the child wants to nurse and Father says "Let me see your boobs. Let me see him suck on your tits." Adding to that, "I have seen your asshole. I've seen your pussy." He indicated that they have tape after tape of this abusive behavior which hurts FM   to watch.

u. He then indicated how they recorded the Skype and identified eight different Skypes which were admitted into evidence and which will be discussed at a later time in this Finding of Fact. Some are audio and some are audio and video.

v. He indicated that there were five Skypes each week and what was put into evidence was just a sample of the bad times.

w. He indicated that Mother's reaction during the Skypes was to try and facilitate the communication between Father and his child; however, if he had to give it a percentage, he would say that 90% of the Skype would be Father screaming at Mother and 10% reading to J     . Adding, they never finished a book.

x. He said that after the Skypes, she would be in a shell and be nonresponsive and it would take him hours to get her to react.

7

850a

y. He indicated that he tried to mediate by asking Father to please use this time wisely and make the best of his time with his son.

z. He also indicated that he offered to fly Father to California as he thought it would promote a good relationship and that he is willing to organize a Skype every evening to benefit the child.

aa. He indicated that he knows the Bay area well having worked in Silcon Valley before. The schools are excellent and the work and living environment are with all professionals and he has a big family that is all very close.

bb. He indicated that he has only lived the past five years in Honolulu and before that he lived in Palo Alto.

cc. He testified from what he knows and from what he read in Court documents that the Mother could remain in Hawaii with the child and that they would not be in any trouble.

dd. He was aware of some offers to have Father to come to Las Vegas or maybe New Orleans but Father never took those offers.

ee. He indicated that he and mother are both Catholic and were raised in the Catholic faith and he believes that religion. He said he has heard Father tell the child that "the Jesus Christ story is bullshit."

ff. He indicated he helped Mother file the PFA against Father in Hawaii and thought it was necessary because of the abuse of Skype calls.

gg. He testified that he has been looking at Silicon Valley, looking at jobs there and across the country. That is the best spot for him to go.

hh. The parties are getting married on July 16, 2016, at St. Joseph's Catholic Church in Elk Grove, IL. It is just a matter of going through the process.

ii. He believes that he will live in Mountainview in the San Francisco Bay Area and he has a good chance at working for Google and they have a great school district.

jj. Plaintiff's Exhibits 9 through 15 were pictures of parks and stores and schools and other amenities in Mountainview CA in the San Francisco area.

kk. He indicated that St. Joseph's in Mountainview has a great preschool or there is the daycare center which has great education.

ll. The schools are good from preschools through high school.

mm. He discussed picking up J____ from the Lancaster Sheetz and Father approached his car screaming "I am not handing my son over to you. I don't care call the police." FM____ indicated he had the child and Uncle Justin Lougee in the car.

nn. Father said he would not hand over his son because he said "You lied about me in Court."

oo. FM____ decided to leave the Sheetz, drove about seven minutes stopped and called ADW____. He drove back to the Sheetz because she called the police.

pp. He believed LAK____ left but came back. They were both gone about 30 minutes total.

qq. When he came back, he started the usual questions such as "Tell me where my son's mother is." Also, he made another statement that "My son's name is Max."

rr. He next testified about the January 14, 2016, doctor's appointment for a check up and their 2:30 meeting at Sheetz in Falls Creek. FM____ indicated when he pulled in, Father parked two spots away. FM____ got out and started unbuckling the child to which Father said "No! No! I'll get my son," and he pushed FM____ away saying "Move!

8

851a

Move! Move! I want to get my son. It's 2:40. Where have you been?" FM reminded him of the doctor's appointment.

ss. Father indicated "I want a report of that visit." After which, he grabbed J and walked to the car saying "These people are trying to take you away from me." He said that twice followed by "These people are not your friend."

tt. He also explained how he checked on the weather in Lancaster after the big storm through NOAA and that it was listed that the roads were safe while Father was saying the road was closed.

uu. He indicated that a Skype could be doctored but there was no doctoring done on these Skypes. They were made on third party review and it would be too long and too complex to doctor the Skypes.

vv. He clarified when Father was pushing him he was really bumping him with his chest.

15. The next witness called was Rebecca Lynn Getschman-Padua. She is a clinical psychologist from Hawaii who treated and continues to treat Mother. She testified as follows:

a. She is a clinical psychologist who specializes in trauma and abuse in children and adolescents.

b. She got her degree from The Forest Institute of Professional Psychology in Honolulu. She graduated in 1990 and has been in private practice since 1993 and has spent 35 years treating children, families and adults in private clinical work.

c. She has dealt with and worked with victims of all forms of abuse.

d. She met A D W as a patient in February of 2015, and feels at the time ADW was dealing with extreme trauma and abuse. She believes this came from LAK 's Skype and abusive messages.

e. Her history from the patient showed no mental health concerns and excellent performance in college classes she took.

f. She established a business relationship with the defendant and realized the controlling signs of abuse, which is why she left the house they set up.

g. She indicated that Mother initially brought auditory recordings of the Skype sessions then brought audio and video to her counseling sessions.

h. She found the Skypes to be "pretty horrifying" stating most conversations focused on Ms. W _ .

i. She encouraged Mother to have someone else to run the Skype sessions and she recommended in getting an attorney and a temporary restraining order.

j. She indicated that emotional behavior and social problems can become used by abusers themselves and are a form of abuse.

k. She described Father as being "clearly obsessed" with Mother.

l. She indicated on the Skypes, Father addressed Ji as "Max" which caused her concern showing that Father is not thinking of the welfare of the child by confusing the child. Father is only thinking of himself.

m. She was able to make a diagnosis on Mother of post traumatic stress disorder and battered woman syndrome.

n. Part of her counseling is to empower the woman to get control of her behavior so the woman does not give up.

o. She indicated that she had extreme concerns with the child being very anxious.

p. Mother clearly had fear of Father.

9

q. She has never spoken directly to Father or asked him to contact her regarding the treatment.

r. She did not know the legal status of the custody case but she knew that Mother did not get the final protection order in Hawaii.

s. She indicated that Mother did not show the symptoms she currently shows until two to three months after moving in with Father, this was by Mother's self report.

16. The next witness called was James Horner who lives at 92 Third Street, Falls Creek, Pennsylvania. He is acquainted with the W      Family. He testified as follows:

a. His fiancée was best friends with Maternal Grandmother's deceased husband growing up and that he lives two blocks from their residence.

b. On December 17, 2015, he was getting air in his tires at the Falls Creek Sheetz and saw Maternal Grandmother getting gas while a man was taking a picture of her with his phone.

c. When Maternal Grandmother got J      out, this man pulled the child away and yelled at her. Mr. Horner identified the man yelling as Father. He said he was not really able to make out what Father was saying.

d. He indicated that when Maternal Grandmother got in her car to leave, Father smacked her car with his right hand and she got out of the car as if her window had broken.

e. Father then put the child in the car seat and proceeded to leave.

f. This was the only time he witnessed one of the exchanges and he never spoke to a police officer regarding it.

g. He was positive that Father had the child in his arms while he was smacking the windshield of Maternal Grandmother's car.

17. The next witness called was Gregory Gornati. He has a professional address of 1094 Chestnut Avenue, DuBois, Pennsylvania. He is a Sandy Township police officer who testified as follows:

a. He has been a full time Sandy Township Police Officer for six years.

b. On December 17, 2015, he was contacted by Chris      about an incident at Sheetz wherein she advised that her vehicle was struck by the hand of an individual.

c. He requested video from the Sheetz store and explained that the incident occurred at pump two and that he had obtained the tapes.

d. His testimony basically mirrored what Mr. Horner testified to with the exception of "you can only see the right hand pull back but you cannot see it strike the car due to the gas pump being in the camera view."

e. He called Father to ask him what happened and said that Father initially denied striking the car but then admitted he struck the vehicle and this was over frustration of not being told things.

f. Officer Gornati did not bring tapes with him because it was an open investigation.

10

853a

18. The next witness called was Dr. John Gransee. He has a professional address of 313 West Liberty Street, Suite 226, Lancaster, Pennsylvania, where he is a clinical psychologist. He testified as follows:

    a. He received a Bachelors and a Masters of Psychology and then received his Ph.D. in clinical psychology from Alliance University and is licensed in the Commonwealth of Pennsylvania.

    b. He was ordered by the Court to perform an evaluation of the parents, grandmothers and significant others. He administered the MMPI.

    c. He reviewed the records provided, Facebook exchanges, text messages, Skypes and performed two interviews, minimum, a third interview for each of the parents, indicating that much information was provided primarily coming from Father.

    d. He also read through court documents that were provided and had parent/child observation form from each of them along with a parenting history survey completed by each parent.

    e. He observed that the child had a good bond with Father and was comfortable with him and seemed to be well behaved.

    f. The child was comfortable with Mother and had a good bond and she was effective with her interaction but the child pushed the limits a little more with Mother.

    g. He observed Mother engaged in breastfeeding during his observation which he found as unusual. But then described that the child is of age where you cannot automatically say "It's out of whack" to do that but more of a personal choice.

    h. He authored a September 6, 2015, wherein he indicated the parents should maintain the status quo and that both parents should be involved in individual therapy and co-parenting therapy.

    i. He believed that it would be beneficial for both parties to engage in that type of counseling.

    j. He did have a conversation with Dr. Padua and listened as she explained her findings. He also reviewed the Skype sessions and was concerned with the serious boundary issues which are apparent from the Skype.

    k. He further went on to explain how Father was attempting to engage Mother in conversations that have nothing to do with the child.

    l. He was also concerned with the length of the Skype communications and the age of the child stating that it was difficult to consistently engage a child for that length of time.

    m. He indicated that although the Skypes were very intense and crossed borders, it was not clear that J    was highly affected or paying attention to them.

    n. He further added that he obviously could be affected and thinks that eventually if it constantly went on the child would be affected to his detriment.

    o. He indicates that the Skypes show that Father has focused all of his anger and frustration.

    p. He then focused on Father's demonstration of having difficulty with boundary issues and Mother's anxiety relating to be anywhere near Father. He indicated this could be a problem and would need to be addressed through counseling.

    q. He indicated that he was unsure he could say that Father was obsessed with Mother; however, he did say it was safe to say that Father exhibited excessive tendencies

11

854a

and used excessive behaviors in these situations. Dr. Gransee also indicated that he has great concern about the boundary issues that Father has.

r. He further indicated that the child would have an emotional reaction to the hostility between the adults.

s. He indicated that the child is relatively comfortable and reacted well with FM :. He indicated that J was insecure when Mother left the room and that he was not yet secure to be with FM alone.

t. He indicated that the child is very close to his maternal grandmother and would ask for her or his "mommy."

u. He was concerned for both parents and how they might be affecting the child. Neither parent can claim the "good conduct award."

19. The next witness called was A D. W. who lives at , Pennsylvania 15840, who testified as follows:

a. She is employed by Chanel Incorporated and is asking now to relocate to the San Francisco Bay area of California.

b. Her new offered position is as a retail manager with businesses in the neighborhood of $7,000,000 gross sales which is $2,000,000 more than her previous position in Hawaii.

c. She quit her previous position in Hawaii when she lost her appeal deciding she had no other choice. She called to resign and talked to a vice president who got back to her with an opportunity for employment on the main land.

d. The vice president suggested the position and sent an offer to her on June 2nd.

e. She indicated that being a retail manager in San Francisco Bay still allows her to be highly visible with Global Brands flagship stores and that she hopes to use this to work her way into a director's role and a long term position on the East Coast.

f. She indicated that the position last year paid her $117,000.00 in gross wages and that she got $10,000.00 in relocation expenses.

g. Her new position pays a base salary of $89,655.00 plus bonus of close to 25 percent.

h. She has no limit on expenses and her expense account taking customers and vendors to lunch.

i. She has internet phone and office supplies and is permitted to work from home for much of this job. It does not require as much travel and is more high profile.

j. Her home office would be in Mountain View, California, and her report to stores would be in Palo Alto area, along with the Union Square flagship accounts.

k. She has fifteen days paid vacation and holidays.

l. When she moves and gets a car, she will have a vehicle allowance.

m. She indicates that the company is very aware that she is involved in custody litigation stating "It's a woman's company" and described Coco Chanel as an orphan who worked her way up and takes care of women. Her vice president has taken care of her many times in this "career" with Chanel.

n. She indicated that as a person who does not possess a college degree it is a very good opportunity and that part of this opportunity is having the same vice president all along who keeps making these additional offers and protecting ADW 's job.

12

855a

o. She indicated that Father has made every effort to get her fired by reporting her as having stolen from the company, indicating that he left a voicemail with the vice president which has been admitted as Plaintiff's Exhibit 21, a cd copy and transcript.

p. She recognizes the voice as LAK and describes listening to it as "a punch in the gut."

q. She indicated that she has been living in Falls Creek, Pennsylvania, but has traveled to San Francisco, California, as required by her job but she often takes the red eye flight.

r. She also gets health, dental, eye and life insurance with her job which she described as "having great benefits." She has a 401(k) in which she contributes up to 10 percent.

s. She indicated that when she was pregnant she had no insurance and she owed bills in the amount of $50,000.00 initially to Penn Highlands.

t. In her testimony, when describing her son's relationship to Father she said "I want him to be there with LAK." She was saying this when she indicated that the proposed move was not to keep the child from Father.

u. When describing her fiancé FM, she said "I couldn't be luckier ... he is everything ... everything a woman could want."

v. She indicated that FM set up a college fund for her child, J, and that he and his engineers get together and they are good support for the child as well as her.

w. She further described him as "The best guy in the universe" and she is excited to marry him and be part of a large Philippino family.

x. She indicated that FM is always looking for a solution to pull the emotion out of arguments.

y. He is easy going and just a nice guy.

z. She spent a great deal of time talking about the degrading nature of the Skype messages and how much Father concentrates on harassing her rather than paying attention to his son.

aa. She discussed how he tries to touch her at the exchanges and further said that he attempted to touch her in the courtroom on October 9.

bb. She said a normal day with her son is spending a lot of time outdoors, doing a lot of dancing a lot and letting his imagination go to work with different games.

cc. She indicated that since she can work from home, she can work heavily when the child is napping or sleeping.

dd. She indicated that she believes her child eats very well and healthy but that the child's diet is not good enough for his father.

ee. She discussed the area where she is planning on moving, calling it very nice, very well educated, very cultured with a sense of community. She indicated that J knows some of the people in the neighborhood and has had play dates.

ff. When cross examined, she will many times tell him to contact his attorney, she stated "I always respond to his questions. I never tell him to shove it as he tells me."

gg. She gave her reasons why she waited in Hawaii while her previous case's Order proceeded through appeals court.

hh. Her answers were unsatisfactory and lacked credibility in dealing with why she did not return to Pennsylvania.

13

856a

ii. She does not feel as though she has ever placed obstacles to custody or visitation but that Father places obstacles to custody or visitation by raising his voice and the things he has said to her.

jj. She indicated that she did not think it was a problem to put the child in the Hawaii Life Program, when she indicated the producer told her that it only required the primary custodian to place the child in the program. She indicated that the matter had to be refilmed after LAK proclaimed that his child did not have permission to be in that program.

kk. She believes that the differences in education the child will receive in Pennsylvania and California are tremendous and that she and FM are financially secure and able to care for the child.

ll. She indicated that the cost of a roundtrip ticket is around $300 and from Philadelphia to San Francisco, the child would be on a plane for 3 hours and 36 minutes, just about the same as he would be in a car to Lancaster.

mm. She claims the jobs that Father found for her on the internet did not match her experience or her position she has in California.

19. The next witness called was Detective Ray who has an address of 157 West Mitzler Road, Brownstown, Lancaster County, Pennsylvania 17508. She testified as follows:

a. She is a detective with the township police where the Sheetz is located in which the parties exchange custody in Lancaster County.

b. On October 25, 2015, she was called to the Sheetz. A man was sitting on the curb holding a child and there were two other males in a car. They were in a custody dispute.

c. She indicated the child would "freak out" every time Father got near the car and that she explained the police did not get involved in civil matters and informed the people to contact their attorney. She described the child as being upset and crying.

d. The two men were the Lougee father and son who had come to take the child back to his mother. Justin Lougee is the child's uncle.

20. The next witness called was Lawrence M. Satifka, who is a licensed psychologist at 200 Pine Street, Suite 400, Williamsport, Pennsylvania. He testified as follows:

a. He has been licensed as a Pennsylvania psychologist since 1988. He received his Bachelor's Degree from Edinboro University in 1980 and received a Master's Degree in 1982 in Clinical Psychology and was licensed four years later following a national exam. He worked under several other psychiatrists including this Court's mediator, Dr. Allen H. Ryen.

b. The Court ordered him to perform several psychological assessments on both Mother and Father to rule out any mental illness which would affect the ability to parent or co-parent. He performed the evaluations and authored the reports that were submitted to the Court.

c. He discussed the dates that Father met with him, engaged in clinical interviews as well as the MMPI2, the inkblot drug and alcohol use test. He indicated that Father came with a wealth of documents and he reviewed a whole lot of documents surrounding this case.

14

d. In his practice, he initially does the MMPI 2 and then sends it out to be computer scored by Dr. Robert Gordon of the Allentown area.

e. He explained the difference in raw score between his and Dr. Gransee's testing by the parent having taken this test a second time as well as him informing the parent of the potential up and down nature of the scales when a parent is trying to look better than that parent actually is.

f. He indicated that Father had an inflated sense of self-esteem with superficial emotions, that he denied his faults and proclaims his virtues.

g. He said that all ten clinical scale scores for both parents were within normal ranges, although he discussed tendencies that both parents exhibited.

h. He found no problems of drugs or alcohol with either parent.

i. With regard to the inkblot test, Father had a reflection response which is highly unusual in adults and points to a potential narcissistic view of oneself to the world.

j. He discussed narcissism from a clinical standpoint calling it a personality disorder of extremely self centered people, their ego conditions and that they have little empathy and are grandiose.

k. He said Father had a tendency toward narcissistic traits.

l. He called that a less than optimal way of relating to the world saying that a narcissist can be so hung up on oneself when someone rejects them, it can cause problems.

m. For a practical application to the present case, he discussed Father's continual use of the name Max for his son, stating that it is a nickname. He described this as saying that since Father feels it is better for him, he does not care about the effect it has on his son.

n. He indicated that each of the problems discussed regarding custody exchanges would not surprise him because of the narcissistic tendencies.

o. He indicated that Father scored in four of the nine categories necessary to diagnose narcissism but stated he had to score in have five to have a diagnosis.

p. He believed it would be highly difficult for Father to get therapy stating he would have to take an honest to God look at himself and admit and want to change.

q. He followed this up by saying "I like him ... He's intelligent, social and extroverted."

r. Because he has narcissistic tendencies, he believed Father's prognosis is guarded.

s. He indicated with regard to Mother, she appears to be naively trusting of others.

t. He believes she saw herself as having a history of being unloved and she advised him she had Post Traumatic Stress Disorder.

u. He proposed he believes people can change and he has seen some movement of the parents to make the child available but indicated that we cannot know everything and said "I wish I could be a fly on the wall at the exchanges."

v. He wrapped up by saying "These are two kids that never should have gotten together. We need to pick our partners with more scrutiny than what is available on E-bay." [sic – the Court believes he meant e-harmony].

15

858a

21. The next witness called was S         R. K          . She lives at                    , Lancaster County, Pennsylvania. She is the live-in girlfriend of Father and she testified as follows:

 a. She entered into a relationship with LAK on August 31, 2014.

 b. She is 31 years of age and is employed by the Reading Health Systems as a Supervisor of Radiology.

 c. She took radiology at Mansfield and got her Bachelor's Degree from Saint Francis.

 d. She moved into the LAK household on October 3, 2015, with her two children I    R    age 7 and L    W    age 5.

 e. She has custody of those children from Thursday to Sunday every week. They get along well with J    and they look forward to seeing him.

 f. When he is at home, he is pleasant and happy.

 g. She said they do everything as a family. From Lego to Lincoln Logs, spend time outside when the weather is nice and they are working on reading the Swiss Family Robinson. They associate very well with the LAK family.

 h. She sees his brothers and other members of his family.

 i. She stated they began dating when the child was in Hawaii and this was very hard on Father. He was frustrated and heartbroken. Her telephone or Skype sessions, although they were quite often, many attempts were to no avail.

 j. She was only ever there for one of the Skype sessions that were 30 minutes and it was all appropriate.

 k. She saw him ask questions to gain insight to his child's life. They were not answered.

 l. She said Mother's main response to his questions were "Talk to your attorney."

 m. She indicated that they all resided at a Bed and Breakfast and they never had an unhappy client.

 n. She works Monday through Friday, 1:00 p.m. through 9:00 p.m., so she is available to help with the kids.

 o. She indicated that the father of her children and all of the children's grandparents live within 45 minutes and they accept J    as part of their family.

 p. She keeps a log of exchanges on the Sunday hand offs. She goes to every exchange herself but does not expose those exchanges to her children.

 q. She indicated problems caused at the exchanges were caused by Mother's family.

 r. She indicated that Mother was at the exchanges quite often until August.

 s. She indicated that in the October exchange it was talked about when Justin Lougee and his father came down, the child did not want to go with them and was hysterical. She also said that the police officer told them there was nothing he could do but that Father was the reasonable one with getting child in the car.

 t. She does not believe that Mother keeping J    would be in his best interest. She believes Mother would take him back to Hawaii and keep Father and his family away from the child.

 u. She indicated that Father gets upset at the exchanges when there are two people in the car that he does not know and they will not talk to him.

16

859a

v. She discussed the school districts and day cares in the area and said they were good.

w. The child has displayed anxiety by chewing his fingernails all of the way off at the first partial custody times. She said he is comfortable with the family and does not chew his nails any more.

x. The child is very happy, incredibly intelligent and has fine motor skills. She added "He has a lovely time when he is with us."

y. She said at his age, she has a plan for potty training which Mother does not.

z. She indicated that her marital status is now divorced and she lived in Reading prior to meeting Father. She sold the home in Reading and she pays rent to Father for one half of his mortgage or $1,150 a month a total of about $1,350.00 per month. She describes that as not a lot of money for the quality in which they live.

aa. She has a profit from the sale of her home that she keeps in a bank account and she pays rent from money she gets from work.

bb. She made a reference that FM has lied and they plan on prosecuting him. They decided to focus on the custody case first before they take criminal action. She believes that both Mother and FM have broken the law.

cc. She indicated that they call the child by "Max" which is his nickname and she does not see it as a problem for the child.

22. The next witness called was Dr. E        H        who lives at
ι, Lancaster County, Pennsylvania. He testified as follows:

a. He has a Bachelors Degree in Biology from Edinboro University and a Master's from Duquesne in Cellular Biology and almost had a Ph.D. from Delaware. He then graduated from the University of Pennsylvania Dental School in 1986 and works as a dentist.

b. LAK is his son. He married N    K        26 years ago. He has three children of his own: Will, Julian and Brittany and a foster daughter. He said he does not treat any of them any differently.

c. He indicated that Mother's family is welcome in his family and she came to live with them. They opened up their house and their hearts but things have changed and now they are trying to keep his grandchild away from the family.

d. As patriarch of the family, it put a horrible strain on their compassion, honor, integrity. Their harmony has been dramatically disrupted by the alienation of his son's parental rights.

e. He believes that Mother is engaged in parental and grandparent alienation and she puts herself more important than his grandson.

f. He indicated that while she was pregnant she spent endless weeks sleeping in the hospital while her father was dying.

g. He indicated they call him Max as a nickname.

h. He indicated when they first got to meet him he was non responsive, pale, non verbal, non communicative and was a "failure to thrive" situation. Now he is laughing and jolly and having fun.

23. The next witness called was N    H    who lives at
PA. She is the paternal grandmother of the minor child and the wife of E        H.    She testified as follows:

17

860a

a. She has a Bachelor's Degree in Special Education and a Master's Degree in Science. She works with kids with special needs in the Lancaster Lebanon Intermediate Unit.

b. She describes her family as being very close and says that J    is very comfortable and having a lot of fun with the family.

c. She describes her son LAK  as a consistently wonderful person and one of the most patient people and incredibly loving.

d. She described how LAK helped while her mother was ill and had dementia.

e. She indicated that her entire family is in close proximity to Manheim, within 25 minutes away.

f. She indicated that since the last court hearing, things have gotten worse as "There have been tricks played" by Mother and her attorney.

g. She indicated that at a lot of the exchanges, Mother is aware of what can get a rise out of LAK .

h. She indicated that they live on a farm, children can tunnel in the hay and build dams in the creek and do other things when all of her grandsons come. She indicated that J   loves playing with his cousins.

i. She indicated that the elementary school is 2-3 blocks from their house.

j. She indicated that Father cooks, does laundry and helps the child read and get ready for bed.

k. She indicated that Father helps the child speak in sentences, laugh and makes transitions quite smoothly. She believes that Father has made an impact on Father being a happy boy and that he now has no nightmares.

l. She believes that Father has post traumatic stress disorder since he had to go so long without his child and that they pray for the W      's every day. She said they love peace and healing.

m. She believes the child has bonded to his mother and maternal grandmother but she said she has never seen the child running to Mother or reach for Mother or call Mother's name.

n. She believes Mother keeps the child for the financial benefits.

o. She believes the only thing that would be good for the child would be for Father to have primary custody, or as she calls it, full custody.

p. She believes the child needs consistency and the child would have more consistency with Father.

q. She does not believe a 3-1/2 hour plane ride is good for the child.

r. For the future, she hopes Mother will be willing to communicate with them.

24. The next witness called was L. A    K     who lives at                         , Lancaster County, Pennsylvania. He testified as follows:

a. He was born on March    , 1977. He will be 39 years old. He has a Bachelor of Science in Business Administration from Clarion University and indicates that he has a "street education."

b. He is the father of J    T    W     born July   2013, who he describes as healthy and in pretty good shape.

c. He indicated that he mentally struggles with the stress of litigation.

d. He complained about the evaluations that had to be done for the custody case.

e. Father has seen some counselors and feels it would benefit him since the whole custody process has been a frustrating experience. He said he wants to seek the best doctor he

18

861a

can because he has a "compendium" of evidence that Mother is trying to keep him away from his son.

f. He said Mother is constantly adversarial and he is in a position where he just wants everybody to do what is best for his son.

g. He indicated that he did have a DUI charge from his last week of college at Clarion which he served in New Jersey and a fine for burning brush but he has no alcohol or narcotics problems.

h. He indicated that he has Judeo Christian beliefs but identified himself as Jewish stating his father's family is Jewish.

i. He went on to point out that Mother had deprived him of 376 days and said she held him in a completely negative light.

j. Father runs a bed and breakfast where he cooks for anywhere from two to six people plus three kids.

k. He currently has a cash flow problem because of the custody case stating he has spent upward to $100,000.00, which he believes everyone should see how frustrating that was to spend money.

l. He then went on to say about Mother "She is still a wonderful person. I was engaged to her." He stated he would not hold anything against her and he would see through these challenges as a father.

m. He indicated his mortgage had been late because of the custody at times but indicated that he has money to pay and he has no bills unpaid along with his child support.

n. He said his financial "rockiness has totally leveled out."

o. He described his son's eating habits as being a "grazer" stating "he takes a couple of bites then runs," but he feeds him a well balanced, healthy diet that is low in sodium and sugar and is taking him away from the "pre-diabetic lifestyle" that Mother has him set up on.

p. He then talked about the child's excrement, he said when he gets them he does not poop for two days but he believes he should do it four to five times a day with color changes, describing this as a wonderful mechanism for disposing of waste.

q. He bathes the child, does the laundry, saying by running the bed and breakfast, he took the feminine role, doing laundry, ironing and taking care of the children.

r. He indicated he would never need daycare because he is at the bed and breakfast 100% of the time.

s. He described some of the problems of the exchanges as there being 18 to 20 different individuals he does not know as a father and said "I am not going to be pushed over as a father."

t. He indicated that the child loves both of his parents and should be with both his parents in a co-parenting situation. He said the parents needs to care for their child and not be in this court room. He then used a quote he said several times, pointing to himself "This family has unconditional love." Then he pointed to Mother and said "That family has conditional love."

u. He discussed three complaints he had against Penn Highlands pediatricians, one was their intake secretary handed documents to the plaintiff upside down in front of me. One of the staff said to the plaintiff that she had something for the plaintiff's mother and finally that they testified against him. As a side note, throughout the testimony, many witnesses indicated that Father used the term "You testified against me" as a statement against them. This confirms that Father apparently holds ill feelings toward anyone Mother called to testify in the Trial. Father indicated that he currently has an investigation going on against Dr. Fatula and his office.

19

862a

v. Father indicated that when litigation started his business was a six bedroom and breakfast. He has now reduced that to four. He put into evidence pictures and a video of his home. He actually put in pictures of himself and his child at pleasant times.

w. He indicated that he put in the pictures to show his interaction with his son stating "He is not afraid. There are no nightmares. There is no crying." He describes himself as being hard worker and said his son "Falls in line."

x. When asked about his insisting on reading to the child over Skype, when the child was a baby, he indicated that it was "The power of speech." If he was not in the room, he wanted to fill the room with his speech.

y. Mother left his residence when she was five months pregnant and he describes that as "That's when all the nonsense started." He further stated that when she left she tried to stay away from him and keep the child away from him.

z. To describe his family he said he is health focused as well as education focused.

aa. He indicates there was no communication from her prior to her moving to Hawaii and that she was gone from May 29, 2014, to June 4, 2015.

bb. He also claims that the Skype sessions were sabotaged by her to have white noise and other interference so he could not hear as well and had to speak louder.

cc. He also claimed that during the Skype sessions, Mother would not refer to him as Father but rather she would refer to him as "the man in the video."

dd. He claimed that he empowered himself to use the UCCJEA to bring mother back from Hawaii but that he spent thousands of dollars and had countless sleepless nights.

ee. He claimed that Mother's witnesses' version of his exchange behavior is exaggerated and that he has had good reason each time he has raised his voice, such as not knowing the individuals and trying to discuss matters with Grandmother. He said Officer Gornati exaggerated and the officer will not return his phone calls now.

ff. He indicated that when the child first returned from Hawaii, he had a greasy Mohawk, was unclean and light skinned.

gg. When the report went in that he had not drug and alcohol problems, he went further to claim that the woman at that office who gave him the evaluation quit her job because she was so upset with the way his custody case is going and the fact that he had to do the test.

hh. He claims he calls his son Max because it means "the greatest."

ii. He then placed into evidence a lot of job descriptions that he found for Mother in New York and other nearby cities stating that she could get these jobs.

jj. He reiterated that the child has no nightmares when staying at his house, stating that junk food causes nightmares and that is probably why he has them at Mother's house.

kk. It was pointed out to him on February 17, 2015, he called her 300 times in one day and texted her 99 times that day. He described that as being part of the frustration of her being and Hawaii and then further stated "Those were attempts to start off communication."

ll. He then stated that he did not believe he made any questionable comments in front of his son and indicated those comments would be harmful to his son. He further stated that he did make inappropriate comments regarding Mother's breastfeeding. His admittance was "Show me a boob. I used to suck on a boob."

mm. He claimed with regard to the rest of the videos and recordings that they were somehow altered or manufactured by FM stating "He has the ability to do that."

nn. He consistently claims that Mother lies about him and he stated that most of the communication while in Hawaii was to assist with raising his child and in the best interest of his

20

child. He went on from that to say that Mother is consistently shoving candy at and into the kid prior to hand offs.

oo. He describes his child custody exchanges as not being positive experiences but says that a great deal of the problem comes from strangers who do not create a positive atmosphere.

pp. Father said he was seeking primary custody but would give Mother "unlimited visitation" as long as it was supervised in his home. He then said "She is welcome in my home anytime."

qq. He indicated that she does not have a whole lot of stability with all of her moving around and she needs to go in front of or be seen by a professional.

rr. He indicated he had to scale back his bed and breakfast plans to make room for a whole family.

ss. He again reiterated that his constantly being involved in the custody case has hurt him financially.

tt. Throughout the days of Trial, in many of the videos and questions from his attorney, the defendant kept saying that all he wanted to do was "co-parent." During his testimony, several times, the Court as well as attorneys asked him to define co-parent and he completed his testimony by being completely unable to define co-parenting as he saw it.

## FACTUAL FINDINGS ON THE EXHIBITS NOT DISCUSSED BY WITNESSES WHICH WERE PLACED INTO EVIDENCE

a. Plaintiff's number 2 is the first of a series of CD videos made of Skype calls between Father and Child. Father begins by screaming and dumping the garbage then sits on the floor and appears to be pushing himself up and down. He uses the word "co-parent" several times, refers to Mother as Ms. W        , screams at her "I want my child" and "You are my child" and asks her to tell him "He's your father" and "Tell my child why he's not at Daddy's house today." He also says several times "We are a family. Tell your son we are a family." He then threatens her stating she "will lose the child" but is willing to give her 50% of the custody if "you want to co-parent." The video is laced with cursing and inappropriate language.

b. Exhibit number 2 begins with Father sitting on the toilet where he sits throughout the entire video indicating that "the human body has waste." He also starts this video by calling Mother dumb and stating "you're so dumb you can't do anything." At some point he says "Fuck you, A       ," and then goes on to proclaim "I'm loud and in charge." He then tells her that it is not going to be OK and that she needs to help herself by giving him what he wants.

c. Plaintiff's Exhibit 4, done on May 26, 2015. Father begins while reading adult literary quotes while his son plays. He talks about love, then screams at Mother. During the video he talks on the phone getting financial advice and lets his son listen to it all. Then screams "Miss W      ! Are we not a family?" He then tells her to call him "daddy" and he tells her that he is one of the people that gets dicked over in custody cases and both women and men get "dicked over." He then goes on to say that he does not believe the story that Jesus is the son of God stating "That story is bullshit." He then tells her that he "likes it fast and likes it good." Then tells her to smash her wedding rings. Finally, as with many of these videos, when Father's time is up he is screaming at her to not go and not to hang up.

21

864a

d. Plaintiff's Exhibit 5 is an audio only of April 14, 2014. He begins this recording by calling Mother a bitch and then tells her that he is recording it. Then he tells her that she is a liar several times and says "Fuck you" followed by "Go fuck yourself." He calls her an idiot while discussing the case and the child can clearly be heard crying in the background. He demands to see Mother breastfeed the minor child saying "I used to suck on those boobs."

e. Plaintiff's Exhibit 6, is the longest of the disks being 51 minutes long. He is most quiet on this disk but does ask several times about nursing and whether he can see her nurse.

f. Planitff 6, was made February 18, 2015, as an audio disk only and the only disk wherein Mother told Father that she was in fact recording the proceedings. Although she testified in Court that she told him every time, this in fact was the only one where she told him that she was recording. It was a disk which had his usual yelling and series of questions.

g. The next disk 7 was made on May 12, 2015. He begins by telling her that he is going to use his head to ruin Mother as well as Toni Cherry's career. He follows that by stating "I will bring you down. I will bring Toni Cherry down." This tape shows his anger the most and is the loudest of the recordings. He calls Mother a "Motherfucker" and boldly declares that he has "a constitutional right to swear" and he has "a constitutional right to do anything." Mother tried to calm Father by stating "Do you want to read a book or sing a song to J    , it could be positive." Father answers by saying "I can't." Father also accused Mother of theft and further screamed "No!" a minimum of thirty times while she tried to hang up the Skype while after he had used all of his time.

h. Plaintiff's Exhibit 21 is a tape recording of a voicemail that Father left with an Executive of the Chanel Company regarding Mother and how he wants her fired. Interestingly enough the person who transferred the audio to Mother is heard at the beginning of the recording stating "What you're about to hear is a message from a technologically unastute person." The message is a long rant to Christine Escobar who is an executive at Chanel. He spends many minutes telling her about the Court Order and how Mother violated it.

i. Defendant's Exhibit G was described on the stand by , LAK      as a 56 minute recorded disk of his home and family farm. The Court played his disk on its computer for at least two hours. It reran the same five minutes of video continuously. It was a picture of the refrigerator, the LAK   kitchen and the contents in the refrigerator. Then a picture from several different angles of Father feeding the minor child, J    , peanut butter. If there was in fact a separate 56 minutes on, the disk put into evidence it does not play and is not contained in any other files on the disk.

j. Defendant's Exhibit H shows nice pictures of a happy family.

22

865a

This continually litigious case comes before the Court for the second time in as many years requesting a modification to a custody order that was never followed and a new relocation (this time to San Francisco, California) after a relocation that had been denied was contemptuously carried out by Mother for a period of 376 days. The litigation in this case has continued unceasing from the day of Child's birth through the present and appears to have no end in sight.

This seems an odd circumstance for what the credible facts would show was a planned pregnancy, and a plan of some long term commitment between the plaintiff and defendant; as the plaintiff left her job in Denver and not only moved in but signed a mortgage for the defendant's bed and breakfast.

Plaintiff's counsel in cross examination of the defendant and his new girlfriend, S K , tried to paint the defendant as a serial searcher and finder of women who would commit to providing him with financial support and allowing him to continue in his position as a stay at home bed and breakfast owner. A preponderance of the evidence could show that to be true. However, she fails to look at the facts that could also show it is just as likely that her client has been searching for a wealthy husband and the largest pile of cash to find from a marriage with F M being the current person in her sights. How did a planned union go so wrong?

During her time in living with the defendant and going to his family farm and shortly after her pregnancy, she must have realized the odd, idiosyncratic behavior that both the defendant and his family (that testified in this Trial) exhibit. She certainly realized that at the very least, their behavior is verbose, boisterous and outward for everyone to see. She must have concluded she did not want to have these traits nurture in her child and commenced to seeing this family's regular behavior as abusive. Then she and her mother began constructing a framework where Father could have not have access to the child. Mother has now in her own mind confirmed the behavior as abusive and shows herself as diagnosed with post traumatic stress from this abuse.

The Court is by no means condoning Defendant's behavior or implying that it has not at times been verbally abusive; however, seven Skype calls and recordings out of more than 300 plus Skypes do not an abuser make. One can also accept the defendant's explanation that these Skypes were showing frustration and were taken after Mother violated this Court's Order in excess of 300 days. The worst of the Skypes occurred after both the Hawaii and Pennsylvania Courts had ordered the plaintiff to return to Pennsylvania and she still failed to return. The Court needs to also align these Skype videos with the fact that from birth until Mother left Pennsylvania with the child, maternal grandmother would allow the defendant only with the child in one small room in her house. As Judge Morgan previously found, a set of factors that clearly showed Maternal Grandmother was not acceptable for facilitating custody exchanges. Make no mistake, it was Court Orders and not the "devaluation of the yen" that caused Mother to return from Hawaii. It was also this Court's Contempt Order that gave Father significant overnight visits and bonding and not Mother's cooperation. But the evidence seems to show she understands and has learned from her previous obdurate behavior.

The Court should not dwell on the past and the past abuses by Mother and Maternal Grandmother but should look to the present and the evidence that was presented. It remains a concern that the exchanges whether they occur at Sheetz in Falls Creek or Brownstown,

23

866a

Pennsylvania, have more contention and conflict than a prisoner exchange taking place in the most remote area of Afghanistan. This is primarily due to Father's insistence on controlling every situation that occurs. The thing that gets him all fired up is the fact that he controls so little and has controlled almost nothing since the child's birth.

The key word of control for Father appears to be "co-parent." When asked directly in his testimony by what he meant by co-parent, Father was unable to provide a definition. He struggled and sputtered many different things (since that word had been so overused on his Skype messaging, taped telephone calls and statements during drop off and pick up) it became apparent that co-parent was not what a normal person would think. Father believes co-parenting (if we are to look at every time the term came up in the evidence and testimony in this case) means parents discussing almost every breath the child takes during a given day. He wants to know how many bites the child ate, how many bowel movements the child had and the color of each bowel movement. This is just a sampling of things he puts under the title "co-parent." When Mother does not show up for a custody exchange, Father immediately insists on knowing where she is. When she does show up for a custody exchange, Father immediately starts peppering her with numerous questions on minutia that are exhibited by the three examples above. When the people do not respond or when Mother does not respond, Father then resorts to saying "she refuses co-parent." Each visit exchange then seems to turn itself into a shouting match or refusal to change custody on the part of the father because of his incessant questions. This Court as well as any professional involved in the custody field would tell Father there is no couple that co-parents in a separation setting which meets his vision of co-parenting.

Some may think Father is not aware of his surroundings or is not able to control himself. However, when this Court told the parents they should not talk, he immediately decided to invoke that point when a hundred year storm hit Lancaster, Pennsylvania, versus invoking it at the exchange point. On each of the three days of custody trial, the trial began with new witnesses coming forward to discuss a circumstance caused by Father at the custody exchanges. Even though he refused to talk to Mother on the guise of what he indicated was a court's order at the time of the storm, he still managed to have new witnesses come forward for his behavior at custody exchanges. It is because of this behavior and inability to communicate at even the basic level that this couple will do better meeting at airports for only short periods and having the distance of 3,000 miles between them.

Mother has been engaged in a long series of counseling. Mother has been going to counseling with at least two different counselors for many years due to Father's obdurate behavior and her own seeming inability to stand up to men in her life. She has come to realize her limitations and problems and has began to cope with them through counseling. Father experimented by going to three different counselors between the second and third day of the custody trial and thought he might have one "he likes." This Court will order counseling so at some point these two parents can talk. Of course, as with any couple, any dispute is at least 20% responsibility of each party and the other 60% to be distributed along a continuum. In other words, no argument or dispute in a relationship is caused solely by one party but it is the responsibility of each party to that dispute at some level, most likely, at a minimum, 20%. These parties, although they planned on living together and planned on having a child, it was not to be. As Lawrence Satifka put it, "These kids should have never gotten together, you need to have more information than you can find on e-bay." (This Court assumes Dr. Satifka meant e-

24

harmony). These two parents are certainly a demonstration of the fact that completely incompatible people can get into a relationship and have children.

What is the good news in this case that is beyond all dispute:

1. Although each party exhibits tendencies toward a certain mental diagnoses, neither party has a diagnosable mental illness;

2. Their child is well adjusted and is bonded to both parents and gets along fine with each of their significant others and he is healthy and well developed;

3. Both parents are working in the field of their choice and with Mother being allowed to move to an area where she can advance and be promoted her professional life will improve and be successful;

4. Both significant others for each party work in their chosen field and are successful in their careers and genuinely care for this minor child;

5. Extended family in either side of this case are willing to do whatever they can to help the parents and minor child;

6. The child is safe and secure in each parents' residences;

7. Both parties now know a Court Order must be followed even if an appeal is taken;

It is these factors and the parents' individual talents, and those of their significant others, that allow for Mother to move and long distance custody to work. As all professionals evaluating this case would point out, neither parent would get an award. That being said the future should be bright of the child as well as each of the parents.

Finally, this Court will not tolerate abuse of the legal system or appellate process to delay implementation of this custody order.

## FINDINGS OF FACT PURSUANT TO 23 Pa.C.S.A. §5328
### Factors to Consider When Awarding Custody

(a)    Factors – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1)    **Which party is more likely to encourage and permit frequent and continuing contact between the child and another party?**
       Neither party is more likely to permit frequent and continuing contact between the child and another party unless it is done exactly in every detail on that party's terms. Father well made up his custody time that Mother took from him by moving to Hawaii when the

25

868a

Court last had this case. However, if Father could, he would deprive Mother of custody and has clearly presented this belief by his behavior and testimony. Both have said they would do more for the other parent to have contact.

(2) **The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the children or an abused party and which party can better provide adequate physical safeguards and supervision of the child.**
Mother filed temporary PFAs in Jefferson County, Pennsylvania, and Honolulu, Hawaii, against Father, both of which were denied. Father has not physically abused Mother; however, his statements and behavior are overbearing. They were described by Dr. Padua as "potentially abusive" and she diagnosed Mother with post traumatic stress disorder. However, this video evidence did not appear to harm the minor child as founded by Dr. Gransee and does not appear to have affected the minor child, or his development or bonding with either parent.

(2.1) Neither party has had involvement of protective services.

(3) **The parental duties performed by each party on behalf of the child.**
Mother performed all of the parental duties for the minor child from birth until June of 2016. The reason she performed virtually all of the duties is because she was depriving Father of his custody and visitation at the time. Since that time, each parent performs all of the duties for the minor child when the child is in their custody.

(4) **The need for stability and continuity in the child's education, family life and community life.**
Each party has an equally stable life. Mother is moving but she is doing so for work and appears to have appropriate friends and connections on her move. Father's financial difficulty caused by Mother's leaving and litigiousness have come under control.

(5) **The availability of extended family.**
Father has his entire extended family as well as his girlfriend's step family within a 45 minute drive of his house. Mother's family is not in California where she intends to move; however, they all appear to be willing to move to wherever Mother goes.

(6) **The child's sibling relationships.**
The child has no siblings at present. If Father marries his current girlfriend, the child will have step brothers and sisters and he appears to get along with those children.

(7) **The well-reasoned preference of the child, based on the children's maturity and judgment.**
N/A as the child was not called to testify.

(8) **The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.**

26

Both parents appear to attempt to turn the minor child against the other parent. Neither parent holds the other in a good light and they both appear to want to say bad things about the other parent.

(9) **Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs?**
Both parents appear equally likely to maintain a loving, stable, consistent and nurturing relationship with the child as long as it is exclusively to the child and not involving the other parent.

(10) **Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child?**
Both parents appear equally likely to attend to the daily physical, emotional, developmental, education and special needs of the child as long as it is exclusively to the child and not involving the other parent.

(11) **The proximity of the residences of the parties.**
The proximity of the residences of the parties is from Lancaster, Pennsylvania, to San Francisco, California. The distance between Lancaster, Pennsylvania, and San Francisco, California is 3,000 miles.

(12) **Each party's availability to care for the child or ability to make appropriate child-care arrangements.**
Both parties are equally able to make appropriate child care arrangements.

(13) **The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.**
Neither party has the ability and willingness to want to cooperate with the other party.

(14) **The history of drug or alcohol abuse of a party or member of a party's household.**
There is no history of drug or alcohol abuse by either party or member of their household.

(15) **The mental and physical condition of a party or member of a party's household.**
N/A

(16) **Any other relevant factor.**
As Dr. Gransee noted, each of these parties fail at each of the factors to consider for custody; however, the child remains well adjusted and as such, both should have some share of custody.

The other factor which the Court should note is Mother's intentional interference with the custody of the child by keeping the child in Hawaii and away from Father. Between the date of the first custody trial and the date some twenty days after the Pennsylvania Superior Court affirmed the Court's decision regarding this allowance of the move to Hawaii. She clearly took advantage of Judge Morgan's initial Order and the appellate process to deprive Father of physical custody.

27

# FACTORS UNDER 23 Pa.C.S.A. §5337(h)
## RELOCATION

**(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.**

The party proposing to relocate is Mother who has relocated with the child and has been the primary caretaker of the child since birth. If Mother and Father lived next door to each other, they would not have any pleasant contact with each other. As such, any significant persons in the parties' lives can be accommodated.

**(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.**

The child is 2-3/4 years and appears to be at a normal developmental stage and appears to be bonded with both parents although the parents do not get along.

**(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.**

Mother appears to have financial resources to accommodate regular visitation between Father and the child which will be discussed in later Orders of Court by deviated from her child support to assist in transportation. This child was living against the Court's Order in Hawaii for almost a year and Father managed to bond with the child through Skype.

**(4) The child's preference, taking into consideration the age and maturity of the child.**

The child, because of his age, was not called for a preference.

**(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.**

Mother did succeed in keeping Father from having any physical contact with the child for 376 days while she was in Hawaii against this Court's Order. However, it appears from the facts that Father would just as quickly keep Mother from having any significant contact and thwarting the custody and visitation of Mother.

**(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.**

28

871a

Relocation would enhance the general quality of life for Mother, financially, emotionally and educationally.

**(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.**

The relocation would enhance the general quality of life for the child. The child will have a better financial situation in San Francisco and emotionally Mother would be happy since she is with her fiancé, far away from Father, protected by her vice president and the schools in the area are incredible. Further, it would benefit this child to have his parents as far apart as possible.

**(8) The reasons and motivation of each party for seeking or opposing the relocation.**

It appears that Mother is seeking employment in the only place that sees fit to hire her due to a prior relationship she has with the Vice President of West Coast Operations for Chanel, Inc. Although jobs on the East Coast are the same title, she immediately said she is not qualified for those positions. It is obvious with the evidence in these hearings that the vice president protects her and gives her a great deal of latitude and work. Even going to the extent of continuing her job offer as this relocation case having drug on. Having a good job in a nice location appears to be the motivation. As far as these parties' relationship with one another, either of them would do anything to keep the minor child away from the other parent. That is the case even though Mother would say things on the stand for example that she wants the child to have a relationship with Father.

**(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.**

There has never been physical abuse by either party. While Mother was living in Hawaii, the Skype and telephone calls became so strange and abusive mentally that she was diagnosed with post traumatic stress disorder. Of course recordings that were placed into evidence were seven out of three hundred plus Skypes and although extremely rude and strange will surely reflect the worst of Father's behavior in a bad time. Further, her counseling will allow her to deal with Father's strange behavior.

**(10) Any other factor affecting the best interest of the child.**

As Dr. Gransee observed, these parents do not get along and both of them do things hurtful to each other which ultimately could be hurtful to the minor child; however, despite the bad parenting from each parent, the child appears to be well adjusted and bonded with both parents. Because of their poor behavior with each other, this Court believes that unlike many custody cases, these parents and the child will benefit from having each parent as far from the other as possible.

29

872a

Mother, for her part, made a friend and continuing ally of the Vice President of Operations at Chanel's West Coast. The facts of how this case has progressed with jobs in Hawaii and being kept open in San Francisco and the opportunity for advancement still being present shows that this vice president, for whatever reasons, cares and wants to protect Mother. All in all, a move to California will benefit Mother and Child and not put Child in a situation where he is traveling significantly further in time than he is in the current custody arrangement. Despite the tortured history of this case and Mother's and Maternal Grandmother's continuing quest to deprive Father of visitation for the first one and three quarter years of the child's life, the child is healthy and bonded. Also, despite Father's inability to see his limitations and do exactly everything he should not do at custody exchanges the behavior has not affected the child. The age of electronics, pure genetics or maybe just some unforeseen connection to our ancestors and progeny has left this child in a position where he is not harmed but in fact has excelled and in fact has bonded with each of his parents. The child has overcome both of his parents' limitations.

This Court puts in place an Order which should allow the parties and child, if followed, to excel until this Child's adulthood.

As such, the Court enters the following Order:

30

873a

IN THE COURT OF COMMON PLEAS OF
JEFFERSON COUNTY, PENNSYLVANIA
CIVIL DIVISION

A       D. W                          :
                Plaintiff,             :
                                       :
        v.                             :       No. 560 CD 2013
                                       :
L. A    K                              :
                Defendant.             :

## ORDER OF COURT

AND NOW, this 11th day of March, 2016,

**IT IS HEREBY ORDERED AND DECREED** as follows:

1. Plaintiff, A       D. W      (hereinafter "Mother") and Defendant, L. A    K
(hereinafter "Father"), shall have shared legal custody of the minor child J    T    W
date of birth July  , 2013 (hereinafter "Child"). Shared legal custody is also defined to include,
but not be limited to, the right of Mother and Father to obtain upon request report cards and other
relevant information concerning the progress of the child in school as well as all medical,
psychologist, counselor, school official, or provided of religious instruction concerning the child.
A copy of this Order shall be sufficient to enable any school official and any medical,
psychological or counseling provider to release information or copies thereof to either Mother or
Father.

2. Mother is permitted to relocate with Child to San Francisco, California.

3. Mother shall have primary physical custody of Child subject to Father's partial
physical custody and visitation which shall occur as follows:

a. Beginning March 24, 2016, at 2:30 p.m., Father shall pick up Child and keep him in
his custody until Monday, April 4, 2016, at 2:30 p.m. Mother will then pick up the child at
Sheetz and keep the child in her custody until April 21, 2016, at 2:30 p.m. Father will then have
the child in his custody from April 21, 2016, beginning at 2:30 p.m., through May 1, 2016. Next,
Father will have child in his custody from May 19, 2016, beginning at 2:30 p.m., through May
29, 2016, at 2:30 p.m. This schedule will remain in effect for each month thereafter. The

874a

Thursday occurring on the full third week of the month until the Monday one week distant from the Monday following that Thursday. From March through the July visit, the pick ups and drop offs will occur at the Falls Creek Sheetz and Lancaster Sheetz which have occurred in the past. However, at July 31, 2016, pick ups will be Father's responsibility to return the child to the appropriate address in San Francisco, California. Father shall return Child by 8:00 p.m. Pacific time and Mother shall return Child by 8:00 p.m. Eastern time. Beginning in August, 2016, and every other month thereafter, Mother shall provide transportation for the child and any accompanying adult to and from San Francisco, California. Beginning in September, 2016, and every other month, Father will provide transportation for the child and any accompanying adult both ways. If Father does not wish to exercise his custody for the months he is responsible for transportation, he shall advise Mother by the first Sunday of that month. This schedule shall progress in that fashion, from July, 2016, until July, 2018. Father shall receive a $150.00 downward deviation from his child support to assist in covering travel costs to accommodate Mother's move to San Francisco. After July, 2018, no further deviations in child support will be permitted as the child will be permitted to travel on his own.

4. Beginning when Child enters Kindergarten:

a. Father will begin his period of custody beginning the third Thursday of every month until the following Monday (one weekend a month). In even numbered years, Father will begin his period of custody from the day after Christmas until New Years Day. In odd numbered years, Father will begin his period of custody from the beginning of the Christmas break through December 29th of that year.

b. Father will begin his period of custody starting the first Friday of summer vacation until the Friday before school resumes. Mother shall provide Father with written notice of the seven day period she will obtain custody of Child during his summer break from school prior to April 1st of that given year.

5. Father shall enroll and successfully complete a psychological or mental health counseling program. After he has attended ten sessions with a therapist, psychologist or counselor, that professional shall contact Mother's mental health professionals for the purpose of eventually beginning and successfully completing communication counseling between the two of them. Father will have attended ten sessions and have the therapist contact Mother's therapist beginning on or before July 31, 2016.

6. When Mother is transporting Child to Lancaster, Pennsylvania. She will make reservations and Father shall pick up at either the Harrisburg International Airport, Baltimore/Washington International Thurgood Marshall Airport, or the Philadelphia International Airport.

7. When Father is transporting Child to Mother, he can make arrangements for Child to fly into San Francisco Airport, Oakland International Airport, Norman Y. Mineta San Jose International Airport, or Sacramento International Airport. All of those would qualify.

8. The child will need to be accompanied by an adult until July, 2018, when he turns five years of age. He can be accompanied by either parent or any family member, friend or agent that the transporting (paying) parent deems appropriate.

9. When a parent has custody of Child, the other parent shall be entitled to three five-minute Skype videos per day. They will occur in the time zone where Child is at 8:00 a.m., at 1:00 p.m., and at 7:00 p.m., in the prevailing time in that time zone on that day. The other parent will need to awaken or stay awake to accommodate Child's schedule. The Skype sessions will be five minutes long and they can be extended up to no longer than ten minutes by the receiving parent if the Skype conversation is productive for Child. If the Skype has the content of Plaintiff's Exhibits 2 through 7, then they should be terminated at five minutes.

10. After July of 2018, there shall be no further deviation from Father's child support obligation. That deviation of $150.00 will begin in August, 2016, by separate Order of Court to the support number.

11. This Order of Court will begin its implementation on March 24, 2016, and both parties will abide by this Order regardless of whether any appeal is filed, this **Court Order will be followed by both parents.**

12. In the event that either party intentionally fails to abide by this Order of Court, law enforcement will take Child and immediately relinquish him to the custody of Jefferson County Children and Youth Services for placement into nonfamily foster care.

13. Such other times as the parties may mutually agree.

14. While in the presence of the child, neither party shall, nor shall they permit any other persons to, make any remarks, nor do anything, which can in any way be construed as derogatory or uncomplimentary to the other.

15. This Order supersedes any prior Orders in this custody matter and remains in effect pending further Order of Court

16. This Court will retain jurisdiction in this matter.

BY THE COURT,

JOHN H. FORADORA, PRESIDENT JUDGE

C: Toni Cherry, Esquire
Lea Ann Heltzel, Esquire